IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

SHARON MORRISON                                                    PLAINTIFF

vs.                                        Civil No. 5:21-cv-05048

KILOLO KIJAKAZI, Acting Commissioner,[1]
Social Security Administration                                    DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Sharon Morrison, brings this action pursuant to 42 U.S.C § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claims for a period of disability and disability insurance benefits ("DIB") under the provisions of Title II of the Social Security Act ("the Act"), 42 U.S.C. § 423(d)(1)(A). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

## I.      Procedural Background

Plaintiff filed her application for DIB on September 5, 2018, originally alleging an onset date of November 8, 2014, and an amended alleged onset date on September 5, 2017. (Tr. 31, 44-45, 58-59). She was 44 years old on the alleged onset date. (Tr. 44, 58). She had past relevant work ("PRW") as a user support analyst, computer programmer, and microcomputer support specialist. (Tr. 16-17, Finding 5).

---

[1] Kilolo Kijakazi became Acting Commissioner of the Social Security Administration on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

The Commissioner denied her applications, both initially and on reconsideration.  (Tr. 76-78, 86-87).  At Plaintiff's request (Tr. 89-94), Administrative Law Judge ("ALJ") Mark Ferguson held an administrative hearing on July 6, 2020, via telephone.  (Tr. 28-43).  Plaintiff was present and represented by counsel.

On August 11, 2020, the ALJ found that Plaintiff had the following severe impairments: depression, anxiety, personality disorder, post-traumatic stress disorder ("PTSD"), and substance abuse.  (Tr. 13, Finding 2).  The ALJ concluded that her impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 13, Finding 3).  The ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to do the following:

> After careful consideration of the entire record, the undersigned finds that, based on all of the impairments, including substance use disorder, the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant is able to perform work where interpersonal contact is limited defined as interpersonal contact requiring a restricted degree of interaction such as answering simple questions, responding appropriately to supervisors and co-workers, and interaction with the public is infrequent and not considered to be an essential job duty; complexity of tasks can be learned by demonstration or repetition within 30 days, few variables, little judgment; supervision required is simple direct and concrete.  The claimant would be off task for 20 percent of the workday.  (Tr. 14-15, Finding 4).

The ALJ then determined if Plaintiff ceased substance abuse, she retained the RFC to do the following:

> After careful consideration of the entire record, the undersigned finds that, if the claimant stopped the substance use, the claimant has had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant is able to perform work where interpersonal contact is limited defined as interpersonal contact requiring a restricted degree of interaction such as answering simple questions, responding appropriately to supervisors and co-workers, and interaction with the public is infrequent and not considered to be an essential job duty; complexity of tasks can be learned by demonstration or repetition within 30 days, few variables, little judgment; supervision required is simple direct and concrete.  (Tr. 19, Finding 12).

With the assistance of a vocational expert ("VE"), the ALJ found Plaintiff could perform work as poultry dresser and order puller.  (Tr. 20-21, Finding 15).  The ALJ concluded that Plaintiff's substance abuse disorder is a contributing factor material to the determination of disability because Plaintiff would not be disabled if she ceased substance use.  (Tr. 21, Finding 16).  Because substance use disorder is a contributing factor material to the determination of disability, the ALJ concluded that Plaintiff had not been under a disability as defined by the Act at any time from the alleged onset date though the date of his decision, August 11, 2020.  (Tr. 21-22, Finding 16).

The Appeals Council denied Plaintiff's request for review on January 22, 2021.  (Tr. 1-3).  She subsequently filed this action on March 11, 2021.  (ECF No. 1).  This matter is before the undersigned for report and recommendation.  Both parties have filed appeal briefs (ECF Nos. 13, 17, 18), and the case is ready for decision.

## II.   __Applicable Law__

This Court's role is to determine whether substantial evidence supports the Commissioner's findings.  *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010).  Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.  *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019).  We must affirm the ALJ's decision if the record contains substantial evidence to support it.  *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014).  Where there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently.  *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015).  In other words, if after reviewing the record it is possible to draw two inconsistent positions

3

from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id*.

A claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § 423(d)(1)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A claimant must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. 20 C.F.R. § 404.1520(a)(4). The fact finder only considers a claimant's age, education, and work experience considering her residual functional capacity if the final stage (Step 5) of the analysis is reached. 20 C.F.R. § 404.1520(a)(4)(v).

III.   **<u>Evidence Presented</u>**

This Court's review of the medical record evidence reveals the following:

On February 4, 2014, Plaintiff saw psychiatrist Randal Scholma, M.D., for attention deficit hyperactivity disorder ("ADHD"). (Tr. 319). Plaintiff was taking Adderall and it continued to work well. She believed that Adderall 30 mg (two times per day) was better than the 20 mg (three

4

times per day).  Plaintiff's mental status exam was normal, and she reported her sleep was ok. With respect to medication, she was taking Viibryd 40 mg daily and Seroquel about half of the time, and she was taking a one-half does of Xanax once or twice a day.  Dr. Scholma opined that Plaintiff was doing well overall and found no reason to update her regimen.  (Tr. 321).

Approximately one year later, on February 4, 2015, Cheryl Fulton, D.O. saw Plaintiff to establish care.  (Tr. 274-275).  She reported a history of headaches/migraines, suffering from a headache on most days.  (Tr. 274).  She had a history of concussions and domestic abuse, stating her tinnitus worsened when her husband was physically abusive.  Plaintiff was assessed with migraine, tinnitus, hidradenitis suppurativa (painful condition of skin), hypertrophic cardiomyopathy ("HCM"), and chronic right upper arm pain (related to a prior job requiring heavy lifting).  (Tr. 275).  Plaintiff was interested in exploring Topamax for her headaches, and Dr. Fulton prescribed Topamax 25 mg (two times per day) along with Mobic 15 mg and refilled Imitrex 100mg.

The following day (February 5, 2015), Plaintiff saw Dr. Scholma for a follow-up appointment.  (Tr. 329).  Plaintiff reported a tough time two weeks earlier but had a normal mental status exam.  She admitted never filling a prior hydroxyzine prescription because she felt like she did not need it but reported compliance with Xanax.  Dr. Scholma diagnosed her with partner relationship problem, mood disorder, and ADHD.  (Tr. 332).

Plaintiff saw Dr. Fulton on March 30, 2015, reporting she never started her Topamax.  (Tr. 276).  Plaintiff indicated she suffered only three migraines in the past month and took Imitrex 100 mg which eliminated her headache. Plaintiff underwent an x-ray of her right shoulder and no acute right shoulder abnormalities were identified; her physical examination was normal.  (Tr. 298).

Topamax was not restarted.  (Tr. 277).  Dr. Fulton ordered Mobic 15mg once daily and instructed Plaintiff to avoid other NSAIDs; Dr. Fulton also ordered a physical therapy consult.

On May 27, 2015, Plaintiff returned to Dr. Scholma and reported that she was not doing well.  (Tr. 334).  She had trouble filling her Viibryd medication due to cost and had not taken it for a month; she was deemed medically frail and approved for Medicaid.  She continued at that time to live with her boyfriend, and he had taken some of her medications, including Adderall; she reported thoughts that she might have battered woman syndrome.  She reported trouble sleeping, though the Xanax occasionally helped.  Her mood was dysthymic.  (Tr. 337).  She was not taking her medications as prescribed and was moderately depressed.  Plaintiff was diagnosed with partner relationship problem, mood disorder, and ADHD.  Dr. Scholma restarted Viibryd 40 mg daily and instructed Plaintiff to continue Adderall 20 mg (two times per day).

Plaintiff presented to Paul Moore, LPC, on November 17, 2015, for counseling.  (Tr. 338-339).  Plaintiff was highly anxious during the session, shifting in her chair frequently; she was scattered in her description of presenting problems, jumping from topic to topic and problem to problem.  (Tr. 339).  She reported having taken steps to remove herself from conflict and trigger provoking relationships; Moore's impression of Plaintiff was depressed and anxious mood.

On December 1, 2015, Plaintiff returned to Moore, reporting continuing significant stressors in her life.  She was easily dysregulated by her environment. (Tr. 342).  Moore's impression of Plaintiff continued to be depressed with anxious mood and history of trauma.  Seven days later, on December 8, 2015, Moore again saw Plaintiff, and she reported she was not happy all the time but was doing okay.  (Tr. 343).  She reported cooking as a coping skill.  She also reported working on re-framing negative interactions from negative family members or peers and trying to avoid internalizing negative remarks from others.  (Tr. 344). Plaintiff saw Moore again

on December 15, 2015, reporting an increase in anxiousness.  (Tr. 346).  Her mood was depressed, and her affect was tearful.  (Tr. 346-347).  Plaintiff returned to Moore on December 30, 2015, presenting with anxious mood, scattered speech, and pressured speech.  (Tr. 349).  Plaintiff reported she was making progress in implementing techniques to decrease anxiousness and manage mood dysregulation related to her prior abuse and trauma.  (Tr. 350).

On December 30th, Plaintiff also saw Dr. Scholma.  (Tr. 352).  Plaintiff reported she was researching places to be hospitalized to get some more help and was considering applying for disability on psychiatric grounds.  She was taking Adderall four times a day and Dr. Scholma discussed the potential danger of her habit of taking too much Adderall, including its effect on her heart.  (Tr. 354).  Dr. Scholma diagnosed Plaintiff with partner relationship problem, mood disorder, and ADHD.  (Tr. 355).

On January 6, 2016, Plaintiff returned to Moore, presenting with a maladaptive mood and behavior related to low self-esteem, unhealthy relationship seeking, catastrophic thinking, and generalizing.  (Tr. 356).  Moore discussed his plan for Plaintiff to reduce symptoms which impaired functioning and increase positive interactions with herself and others to allow for optimal progress through individual psychotherapy. (Tr. 357).  Plaintiff saw Moore on January 18, 2016, who noted Plaintiff is drawn to unhealthy and abusive relationships; Moore confronted Plaintiff for enabling and minimizing thinking, and Moore's impressions remained unchanged.  (Tr. 362-364).  Plaintiff returned on January 25, 2016, displaying an emotionally dysregulated mood and fluctuating between frustration and happiness with her interpersonal relationships.  (Tr. 365).  She gravitated between praising her parents and complaining about them but was unable to specify her complaints.  She was very tearful and expressed feelings of guilt, stating "I don't think my parents value me that much."  (Tr. 365-366).  She was seen again by Moore on February 1, 2016.  (Tr.

370).   Plaintiff found it difficult to face her maladaptive thoughts.  (Tr. 370-371).  Moore opined that Plaintiff tends to make excuses for abusive partners and is emotionally reactive to family but did report being less self-critical.   (Tr. 371).   Plaintiff was working on a distress tolerance assignment but had not completed it. Moore's impression was PTSD, borderline personality disorder, relational problem related to a mental disorder or medical condition, and mood disorder. During a session with Moore on February 8, 2016, Plaintiff continued to present emotional reactions to family and environmental stressors and was engaged in blaming and minimizing which were described by Moore as thinking errors.  (Tr. 375).  Plaintiff had not completed her tolerance assignments.  Plaintiff was next seen on February 12, 2016, where Moore and Plaintiff discussed emotional regulation and patterns of dysregulation in interpersonal relationships. (Tr. 359). Plaintiff was unfocused and had to be redirected.  Moore's diagnostic impressions remained unchanged.  (Tr. 360).

Plaintiff saw Dr. Scholma on March 9, 2016, reporting that she felt intensely lonely at times and was having difficulty shutting down her thoughts at night.  (Tr. 382).  She was taking Adderall three times per day but ran out of her Xanax medication early.  Dr. Scholma discussed the importance of keeping on track with medication.  Plaintiff's mental status exam was mostly normal, except her speech was rapid, mood was anxious, and her affect was intense.  (Tr. 384-385).  Dr. Scholma declined to make an early refill of Plaintiff's Xanax but continued Viibryd 40 mg daily and Adderall 20 mg (three times per day), and prescribed Hydroxyzine 25 mg (three times per day) for Plaintiff's anxiety. (Tr. 385).

On March 21, 2016, Plaintiff saw Moore and described being emotionally drained and lonely.  (Tr. 394).  She expressed that she had stressful arguments at home with her parents; her

speech was pressured, mood was anxious, and thought processes and content scattered.  (Tr. 395).  Moore noted Plaintiff still displayed mood dysregulation.

Plaintiff saw Dr. Fulton on March 28, 2016, for a follow-up appointment.  (Tr. 278).  Dr. Fulton's notes revealed that Plaintiff had left her abusive relationship and was living with her parents.  Dr. Fulton noted Plaintiff's struggles with headaches and that she is prescribed Xanax, Adderall, Viibryd, and Imitrex.  She reported two headaches per week, stating Imitrex made them go away.  She had not been diagnosed with bipolar disorder but wondered if she is borderline and questioned whether she sustained head trauma when her boyfriend previously hit her in the head.  Plaintiff asked to have a brain MRI but exhibited no drooling, slurred speech, or muscle weakness and her physical exam was normal.  Plaintiff was assessed with chronic migraines and an elbow rash.  (Tr. 279-280).  Dr. Fulton prescribed Phenergan 25 mg for nausea and encouraged Plaintiff to quit caffeine and BC powder completely, advising those medications when taken daily can cause chronic headaches. (Tr. 279).    Dr. Fulton noted Plaintiff's elbow rash was likely eczema.  (Tr. 280).

Plaintiff returned to Dr. Scholma on May 5, 2016.  (Tr. 414).  She reported continued therapy with Moore was extremely helpful.  Plaintiff's pattern of taking Adderall and Xanax was consistent and compliant and Plaintiff was working to improve her sleep. Plaintiff's mental status exam was mostly normal, and her mood was euthymic.  (Tr. 417).  Dr. Scholma opined that Plaintiff was overall stable with the assistance of ongoing therapy and medications.  Plaintiff was diagnosed with mood disorder and ADHD, and Dr. Scholma continued Viibryd 40 mg daily and Adderall 20 mg (three times per day).

Plaintiff saw Moore again on June 21, 2016.  (Tr. 434).  She expressed sadness and felt misunderstood and emotionally ostracized by her family; Moore observed Plaintiff's habit of

internalizing criticism and obsessing to the point she is tearful and emotionally dysregulated. Plaintiff next saw Moore on June 28, 2016; Plaintiff presented as extremely depressed. She reported mood swings with intrusive thoughts of being harassed by family members who send her intimidating messages. (Tr. 437). Moore opined Plaintiff was struggling with catastrophic and obsessive thinking. (Tr. 437-438).

Plaintiff saw Dr. Scholma on July 7, 2016. (Tr. 440). She was upset that Medicaid was not paying for her therapy and she was struggling with her borderline personality disorder diagnosis. Although taking Xanax twice a day and Adderall on a regular schedule, she had persistent thoughts of "not being around any longer." Dr. Scholma continued Viibryd 40 mg daily and Adderall 20 mg (three times per day). (Tr. 444).

On August 12, 2016, Plaintiff returned to Moore, wanting to discuss suicidal/self-harm thoughts. (Tr. 454). Plaintiff had prior instances of self-harm in 2014 and 2008 during psychotic episodes from drugs and an abusive relationship. She reported suicidal ideation two nights earlier which had lasted ten to fifteen minutes. Plaintiff reported thinking about using a bag over her head more than a week earlier but was "creeped out" thinking about it. Plaintiff's risk level assessment was low based on clinical judgment and reported/presenting information. (Tr. 455).

Later the same day, Plaintiff saw Dr. Scholma. (Tr. 461). She mentioned her prior thoughts and that she had considered calling the suicide hotline. Plaintiff admitted smoking marijuana a few times in the previous weeks, maintaining it helped her anxiety. Plaintiff inquired about being evaluated for a higher Adderall dose since her current dose only lasted three hours and expressed preferring Clonazepam over Xanax. Her mental status exam was mostly normal, except for presentation of restlessness, pressured speech, and increased intensity in affect. (Tr. 464). She

10

continued to be challenged in therapy, her diagnoses were unchanged, and Dr. Scholma made no medication change. (Tr. 464-465).

On August 23, 2016, Plaintiff returned to Dr. Scholma. (Tr. 466). She stated her mood was still up and down, and while the Adderall is often helpful, there are times when it wears off early or is not effective. Dr. Scholma diagnosed Plaintiff with mood disorder, methylenetetrahydrofolate reductase ("MTHFR") heterozygous C/T mutation, unspecified anxiety disorder, ADHD, and borderline personality disorder. (Tr. 469). Dr. Scholma continued Viibryd 40 mg daily and Adderall 20 mg (three times per day) and prescribed Deplin 15 mg daily.

Plaintiff counseled with Moore on September 20, 2016, exhibiting improved mood and functioning. (Tr. 479). While she reported decreased anxiety, she continued to struggle with depressed mood when activated by external relational triggers but reported a desire to increase socialization and decrease isolating tendencies. Moore's impression was mood disorder, borderline personality disorder, and relational problem related to a mental disorder or medical condition.

On October 4, 2016, Plaintiff returned to Dr. Scholma, stating that "it has been really tough." (Tr. 488). Plaintiff admitted she had over-taken medication in the past, admitted attention-seeking behaviors, and reported more panic attacks. Dr. Scholma restarted her Xanax 1mg (two times per day) and continued her Viibryd 40 mg daily, continued Deplin 15 mg daily, and continued Adderall 20 mg (three times per day). (Tr. 491-492).

On November 22, 2016, Plaintiff was seen by Dr. Fulton. (Tr. 281-283). Her physical exam was normal, and she was assessed with chronic headaches; chronic depression; HCM; and elevated blood pressure. (Tr. 283).

On December 21, 2016, Plaintiff underwent a CT scan of her brain due to chronic migraines. (Tr. 303-304). According to Aaron Woodward, M.D., no acute intracranial abnormality was identified. (Tr. 303).

Plaintiff saw Dr. Scholma on January 17, 2017, reporting that she consistently felt "bad" all the time. (Tr. 532). Plaintiff reported spending most of every day just "trying not to freak out" and stated her biggest stressor was her mother. She was taking more Adderall than prescribed. Dr. Scholma diagnosed her with the following: mood disorder; MTHFR Heterozygous C/T Mutation; unspecified anxiety disorder; ADHD; borderline personality disorder; and insomnia due to mental health condition. (Tr. 537). Dr. Scholma instructed Plaintiff to take Xanax more responsibly and provided a trial of Sonata for sleep initiation.

On February 15, 2017, Plaintiff counseled with Moore, describing elevated fearfulness and anxiety. (Tr. 540). She had not completed a socialization assignment to visit three places and admitted she rarely left her house during the last year, except for medical appointments or for short walks with her father. She reported "I am not safe out there. I need protection." Moore noted Plaintiff ruminated and obsessed over her elderly parent's poor parenting during her childhood and believed her parent's flaws from the past still controlled her behaviors and mood in the present.

Plaintiff returned to Dr. Scholma on March 15, 2017, and reported she was not doing well. (Tr. 554). She felt like the Viibryd might not be working and wondered about starting Pristiq. She was still taking Adderall more than she should and ran out earlier in the month. Dr. Scholma confronted Plaintiff about her aberrant medication use and her risk of developing a chemical dependency. Dr. Scholma noted if Plaintiff ran out of Adderall early then he would stop the medication, but Dr. Scholma and Plaintiff agreed to keep her medications the same for the time being. (Tr. 557).

Plaintiff presented to Dr. Scholma on April 13, 2017, sobbing and hysterical. (Tr. 564). She admitted to over-using the Adderall and Xanax because of stress with her parents. Dr. Scholma informed her that he would no longer be prescribing her Adderall and asked her to bring her current prescription into the clinic to destroy. Dr. Scholma informed Plaintiff that he planned to wean down her dose and potentially wean her completely off Xanax. Plaintiff abruptly left Dr. Scholma's office and expressed that she would not be attending her therapy appointment scheduled that day.

On May 12, 2017, Plaintiff returned to Dr. Scholma, feeling more like herself. (Tr. 575). She weaned herself off Xanax and had been off Adderall for a little over a week. Her mental status exam was mostly normal, and she was laughing at times but had an anxious mood and stated, "I'm high on me." (Tr. 578). Dr. Scholma opined Plaintiff was doing well off Xanax and Adderall and Plaintiff did not want to continue them. Dr. Scholma recommended Melatonin, discontinued Xanax 1 mg, and continued Viibryd 40 mg.

On June 8, 2017, Plaintiff was counseled by Moore, discussing present contextual issues, stressors, and feelings. (Tr. 589). Plaintiff had depressed mood and agitation and frustration over not being prescribed Adderall; she also reported isolated feelings, mood and behavioral dysregulation which were impacting functioning and socialization. Plaintiff returned to see Moore on June 14, 2017, presenting with depressed mood and frustration over her prescriptions being adjusted based on her misuse of medication. (Tr. 592). She continued to display agitation along with mood and behavioral dysregulation impacting functioning and socialization. (Tr. 593).

Plaintiff was seen by Dr. Scholma on June 20, 2017. (Tr. 595). Plaintiff tried Strattera for four weeks but had suffered headaches and a negative mood; she felt improved when she discontinued the Strattera medication. Plaintiff revealed her anxiety was improved and she was

doing well without Xanax. Her mental status exam was mostly normal, and her diagnoses remained unchanged. (Tr. 597-598). Dr. Scholma continued Viibryd 40 mg daily and prescribed Guanfacine 1 mg at night. (Tr. 597-598).

Three days later, on June 23, 2017, Plaintiff counseled with Moore, reporting decreased anxiety and depression and improved mood and communication. (Tr. 600). She was feeling better, and sleeping better, and had stopped taking Strattera and switched to a new medication. Plaintiff continued to display mood and behavioral dysregulation impacting functioning and socialization. Plaintiff returned on July 13, 2017, reporting to Moore that she had an incident of suicidal ideation the prior weekend without plan or intent. Plaintiff gave a verbal contract not to self-harm and reported no current thoughts of self-harm ideation, plan, or intention. (Tr. 605). Plaintiff emotionally advised Moore she needed Adderall because it is the only medication that helps.

On July 17, 2017, Plaintiff saw Dr. Scholma. (Tr. 608). The previously prescribed Guanfacine helped her anxiety, but she reported feeling numb and apathetic rather than bad and anxious; she indicated being more depressed and having lost her sense of taste and smell. She reported tremors, jerking sensations when falling asleep, and losing her balance. Dr. Scholma agreed to restart Plaintiff on a low dose of Adderall with close monitoring and continued her other treatments. (Tr. 611-612).

On July 21, 2017, Plaintiff counseled with Moore, reporting improved communication with her parents, a significant decrease of her anxiety, and increased mood regulation. (Tr. 613). She had decrease in negative self-talk and an increase in self-esteem and "liking myself again." She denied self-harm thoughts, intentions, and ideation. She described feeling less internal stress and pressure, believing "things are good and going to get better."

14

Plaintiff returned to Dr. Fulton on July 25, 2017, complaining of one migraine per week. (Tr. 284). Plaintiff felt her migraines were less frequent but lasted 2-3 days without Imitrex. With Imitrex, they lasted only two hours as even half a pill could help the migraine. Plaintiff reported doing yoga and her physical exam was normal. She was assessed with chronic migraines; HCM; and dental cavities. (Tr. 285). Dr. Fulton refilled her Imitrex 100mg and prescribed a trial of Naprosyn 250 mg with the Imitrex.

On August 17, 2017, Plaintiff returned to Dr. Scholma, reporting her anxiety remained high overall. (Tr. 618). She noticed that yoga, crafts and hobbies significantly benefited her anxiety but that she still struggled with past abuse and hoped to benefit from group therapy for domestic abuse. She reported needing her teeth fixed from all the years of grinding them. Dr. Scholma discussed why he had restarted Adderall with a great deal of caution and warned Plaintiff about her compliance. (Tr. 621). Plaintiff's mental status exam was mostly normal; however, her mood was anxious, affect increased in intensity, and motor function was hyperactive, rapid. Dr. Scholma prescribed Ativan 1 mg and Adderall 15 mg (two times per day). (Tr. 621-622). Dr. Scholma continued Viibryd 40 mg and Sonata 10 mg, and his diagnosis remained unchanged. (Tr. 622).

Plaintiff saw Dr. Scholma again on September 14, 2017, reporting feeling hopeless about her future. (Tr. 628). She believed her trend is going in the right direction, but noted things are difficult. Her sleep was improved by taking Sonata every night. She had taken Lorazepam the previous month for dental appointments and found it helped her. Plaintiff expressed that Adderall was good overall but questioned her current dose because it lasted only five hours. Her mental status exam was mostly normal, though her mood was anxious, affect increased in intensity, and motor was hyperactive, rapid. (Tr. 631). Dr. Scholma noted that Plaintiff continued to have improvement with medications and therapy with continued significant anxiety. (Tr. 631). Dr.

15

Scholma discussed the use of Propranolol to minimize the use of benzodiazepines and prescribed Propranolol 10 mg (three times per day) then 20 mg (three times per day) along with Plaintiff's other medications.

When Plaintiff saw Dr. Scholma on October 12, 2017, her mood was improved, and she expressed the Propranolol was working well and she continued to take Sonata.  (Tr. 638).  She was not experiencing much anxiety but had difficulty finding the Adderall 15 mg tabs from the pharmacy.  She reported reintegrating back into normal society was less intimidating.  Dr. Scholma continued Propranolol 20 mg (three times per day) and Plaintiff's other medications remained the same.  (Tr. 641-642).

Plaintiff counseled with Moore on October 26, 2017, reporting positive communication with her parents with no conflict.  (Tr. 646).  She continued increased socialization and communication and reported she applied as a volunteer with a community group.  Plaintiff had a decrease in mood dysregulation, improved mood, and improved sleep with a couple occasions of bad dreams.  She denied self-harm thoughts, intentions, and ideation, and stated her medications were working well.

Plaintiff returned to Dr. Scholma on November 10, 2017, reporting feeling better than she had in a long time. (Tr. 649). Sonata was helping with sleep, and she reported decreased thoughts of death.  Plaintiff reported Lorazepam was helpful from time to time.  Dr. Scholma opined that Plaintiff was taking her medications responsibly and had not asked for early refills or increased doses.  (Tr. 653).  Dr. Scholma documented Plaintiff's continued improvement with ongoing treatment and therapy.  Plaintiff's diagnoses remained the same and no medication changes were made.

Plaintiff counseled with Moore on November 16, 2017, reporting continued positive communication with her parents and no conflict; increased socialization and communication; and continued volunteer work.  She presented with decreased mood dysregulation and improved mood, and improved sleeping.  (Tr. 655).  Plaintiff returned on December 20, 2017, reporting she felt "at peace," continued to have positive communication with her parents without conflict, and increased socialization and communication. (Tr. 658-59).

Plaintiff saw Dr. Scholma on January 10, 2018, reporting a decline as she was getting physically sick from stress and was not sleeping for days at a time.  Dr. Scholma observed Plaintiff talking fast during her appointment.  (Tr. 667).  Lorazepam and Sonata were helping but she had not taken Propranolol for three weeks.  Dr. Scholma noted Plaintiff was doing fair since her last visit even after weaning off some of her medications.  (Tr. 670).  Dr. Scholma discontinued Ativan, Propanolol, and Sonata, but continued Viibryd 40 mg daily and Adderall 15 mg (twice a day).  (Tr. 670-71).

Plaintiff returned to Dr. Scholma on April 5, 2018. (Tr. 696). Plaintiff's mental status exam was mostly normal, except her affect increased in intensity and her motor was hyperactive rapid. (Tr. 699).  Otherwise, her diagnoses remained unchanged, and Dr. Scholma continued her current medications.  (Tr. 699-700).  Plaintiff also counseled with Moore on the same date, reporting her depression had decreased but she still struggled with anxiety.  (Tr. 1483).

On May 7, 2018, Plaintiff again counseled with Moore, sharing she was managing her anxiousness and depressed feelings with spiritual resources.  (Tr. 707, 1487).  Plaintiff remained isolated at home, but occasionally went to the grocery store by herself.   Plaintiff returned on June 27, 2018, reporting an increase in mood regulation and decrease in anxiety, and expressing hopefulness for herself and others.  (Tr. 1497).

17

When Plaintiff saw Dr. Scholma on July 5, 2018, she reported she was doing well overall and was thinking about re-engaging in society. (Tr. 1500). Plaintiff's diagnoses remained unchanged, her mental status exam was normal, and Dr. Scholma made no changes to her medication regimen. (Tr. 1502-1503).

On August 16, 2018, Plaintiff counseled with Moore, reporting decreased anxiety, dysregulated mood, and clarity on interpersonal goals with an increase in positive self-talk and positive self-esteem. (Tr. 1509). Counseling with Moore occurred again on August 27, 2018, when Plaintiff shared an existential episode where she questioned the purpose of her life; however, she denied suicidal plans or ideations and reported decreased anxiety, dysregulated mood, increased positive self-talk, and positive self-esteem. (Tr. 1511).

When Plaintiff returned on September 10, 2018, she reported to Moore that she had suicidal thoughts the previous Saturday. (Tr. 1115). Her mood was emotionally dysregulated during the session, finding it difficult to articulate why she was sad but relating it to some difficulty with her parents. Plaintiff confirmed she was not sleeping but denied suicidal thoughts or plans. Moore informed Plaintiff's psychiatrist of her mood. Plaintiff counseled with Moore on September 27, 2018, with an elevated mood and was upset that her environment had not changed and that others were not capable of understanding her situation. (Tr. 1518). During this session, Plaintiff expressed her belief that she had Autism and needed Klonopin; she was scattered in topic and her volume was loud at times. Moore noted she displayed low tolerance for environmental stressors and felt her older parents should accommodate her emotional needs.

Plaintiff next saw Dr. Scholma on October 2, 2018. (Tr. 1521). She reported still trying to communicate with her parents; having a surprising suicidal thought a few weeks earlier; wondering if she was on the Autism spectrum; and feeling a lot of stress from her environment

including 2-3 bad episodes per week, particularly in the evenings.  Her mental status exam was mostly normal; although her motor function was hyperactive, rapid, her mood was more anxious, and her affect increased in intensity.  (Tr. 1524).  Dr. Scholma opined Plaintiff was having more anxiety and added Clonazepam to her evening medication regimen.  (Tr. 1524-1525).

On November 28, 2018, Plaintiff returned to Dr. Scholma.  (Tr. 1633).  Plaintiff's disability had been denied and she had a relapse of old emotions with thoughts of suicide.  Plaintiff had stopped taking her Viibryd four days prior and had used marijuana; Dr. Scholma discussed the risks of this decision, noting Plaintiff could become depressed or even suicidal as a result. Plaintiff admitted she does not always take Adderall as prescribed and runs out early.  Her mental status examination was mostly normal, except her motor function was hyperactive, rapid, and affect was increased in intensity.  (Tr. 1635).  Dr. Scholma opined that even though Plaintiff had been in a good place with her mood and anxiety, he expressed concern that Plaintiff was making medication decisions without consulting him, including stopping Viibryd, over-using Adderall, and sometimes over-taking Clonazepam.  Dr. Scholma noted Plaintiff was willing to switch over to the Pristiq for her depression and anxiety which would hopefully be less emotionally blunting.  Dr. Scholma and Plaintiff discussed that she broke their contract for taking Adderall correctly and that he would no longer prescribe Adderall for her.  Dr. Scholma advised he would monitor the Clonazepam closely and discussed the risks of more frequent marijuana use.  Dr. Scholma diagnosed Plaintiff with mood disorder, including difficulties, unspecified anxiety disorder, ADHD, borderline personality disorder, MTHFR heterozygous C/T mutation, and insomnia due to mental health condition.  (Tr. 1635-1636).

On November 30, 2018, Plaintiff was counseled by Moore, revealing she had stopped taking her stimulant medication and was using medical marijuana.  (Tr. 1536).  Plaintiff's mental

19

exam was mostly normal, though her thought process was scattered, and she jumped from topic/theme.  Plaintiff returned to see Moore on December 5, 2018.  (Tr. 1538).  Her mental status exam was again mostly normal, except her thought process was scattered at times, she jumped from topic/theme, and her affect had elevated intensity.

Plaintiff was seen by Sarah Downing, PsyD, on December 13, 2018, due to her concerns about Autism.  (Tr. 1541-1545).  Plaintiff's diagnoses consisted of mood disorder; ADHD; tinnitus of both ears; PTSD; migraine; depression; anxiety; substance abuse; insomnia; tobacco use; and heterozygous MTHRF mutation.  (Tr. 1543).  According to Dr. Downing, Plaintiff was on time and unaccompanied for her appointment.  (Tr. 1544).  She was alert and well-groomed with good eye contact, but a reported mood limited in range – she presented as sad, withdrawn, and anhedonic.  Her affect was labile and tearful at times.  Plaintiff reported she felt better off her medication because her mood was higher.  Suicidal ideation was denied but she reported more incidences over the past few months and according to Plaintiff's mental health history, she was once hospitalized for a suicide attempt.  (Tr. 1543-1544).  Her appetite was decreased, and her speech was pressured but her gait was steady.  (Tr. 1544).  Plaintiff's thoughts were disorganized, tangential, and she was easily internally distracted.

Following her appointment with Dr. Downing, Plaintiff counseled with Moore, reporting feelings of depression.  (Tr. 1546).  Off Adderall, Plaintiff said her affect and mood were slow and sullen.  Her mental status exam revealed slow speech, sad/depressed affect, and scattered thought process jumping from topic/theme.  Continued therapy was recommended.

On December 26, 2018, Dr. Downing performed a neuropsychological assessment of Plaintiff.  (Tr. 1548).  Dr. Downing opined that, based on Plaintiff's pattern of responses, she is experiencing a severe mental disorder.  She thinks poorly of her abilities and struggles to bear

ordinary demands and stressors.  Dr. Downing noted Plaintiff has had trouble developing adequate internal cohesion and coping strategies and has a history of interpersonal disappointments.  Dr. Downing further opined that Plaintiff experiences periods of marked emotional and behavioral dysfunction.  Plaintiff described symptoms of major depression, including chronic self-defeating attitudes, recurrent thoughts of death and suicide, feelings of emptiness and loneliness, restlessness, edginess, and distractibility.  Anxiety was also present with somatic symptoms, fatigue, and insomnia.  Lastly, Plaintiff indicated that she either has abused or was currently abusing legal medications and/or marijuana to the point of experiencing both personal and family problems.  Dr. Downing noted while this may have been a historical issue, it could be discussed in the therapeutic process.

Plaintiff described unusual thought processes and Dr. Downing opined Plaintiff is likely to experience thought disorganization and engage in unrealistic thinking, believing she has unusual sensory-perceptual abilities.  (Tr. 1549).  Plaintiff reported episodes of over-activation, such as heightened excitation and energy level.  Dr. Downing also noted Plaintiff may have a history of symptoms associated with manic or hypomanic episodes.  She completed the Adult Autism Spectrum Quotient and endorsed a pattern of symptoms characteristic of autism.  Dr. Downing stated Plaintiff's risk for suicide should be assessed regularly as well as need for inpatient treatment.   Additionally, Dr. Downing found Plaintiff is likely to reject psychological interpretations of somatic complaints and malaise may impede her ability to engage in treatment. Dr. Downing concluded that a combination of medications and ongoing therapy continues to be the best course of treatment for Plaintiff.  Dr. Downing diagnosed Plaintiff with PTSD; avoidant personality traits; Bipolar Type II; and history of psychoactive substance abuse not otherwise specified.

21

On December 31, 2018, Plaintiff returned to Dr. Scholma, requesting an Adderall prescription, becoming emotional, and crying. (Tr. 1550). Plaintiff's mood was dysthymic, motor function was hyperactive, rapid, and her affect was increased in intensity. (Tr. 1553). She specifically stated, "I'm miserable." Plaintiff and Dr. Scholma agreed to wait on the results of her cognitive testing before any medication decisions were made. (Tr. 1553-1554).

On January 2, 2019, Dr. Downing and Plaintiff reviewed the results of the neuropsychological testing. (Tr. 1555). Plaintiff struggled with her diagnosis, was emotional and expressed substantial feelings of loneliness. Dr. Downing instructed Plaintiff to continue treatment with Dr. Scholma and counseling with Moore. Plaintiff had discontinued her antidepressant and felt that her range of emotional experience expanded, which she thought was positive. Dr. Downing's diagnoses remained unchanged, and Plaintiff encouraged to call with any future questions or concerns.

Plaintiff counseled with Moore on January 7, 2019. (Tr. 1556). She spent most of the session tearful, describing feeling isolated and "outcast" from most people and resisting plans to socialize or find interests. Plaintiff's speech was pressured, mood/affect was tearful, thought process was scattered at times, and she jumped from topic/theme. She reported that her abnormal or psychotic thoughts could become hyper-focused on existential thoughts and themes. Plaintiff returned a week later on January 14, 2019, with an improved mood. (Tr. 1559). She was not tearful, she felt less isolated, and reported that Pristiq appeared to be working. Moore observed that Pristiq (prescribed for depression and anxiety) appeared to be aiding Plaintiff's mood. (Tr. 1560). Plaintiff returned to Moore on January 29, 2019, with an elevated mood and decreased mood dysregulation. (Tr. 1562). Plaintiff reported less self-isolation and decreased tearfulness and her mental exam remained unchanged.

On January 30, 2019, Plaintiff was seen by Dr. Scholma, reporting a positive difference with the Pristiq medication.  (Tr. 1565).  Results from the neuropsychological testing did not support Plaintiff's believe that she had Autism.  Her diagnoses were unchanged, and Dr. Scholma increased Clonazepam 1 mg, continued Sonata 10 mg, and continued Pristiq 50 mg.  (Tr. 1568-1569).

On February 18, 2019, Plaintiff saw Dr. Fulton, expressing she had fewer headaches since increasing her water consumption but had had a recent migraine.  (Tr. 286).  Dr. Fulton noted Plaintiff exhibits elevated levels of anxiety levels and depression, but counseling had been beneficial.  Plaintiff's physical exam was mostly normal except for a small eczema patch on her right elbow.  She was assessed with acute on chronic migraine; tobacco use; hypertension; and eczema.  (Tr. 287).  Plaintiff was counseled but was not ready to quit smoking.  Dr. Fulton prescribed a trial of Lisinopril 10 mg daily and advised Plaintiff to stay on a low salt diet and to exercise most days of the week.

Plaintiff was counseled by Moore on February 28, 2019, reporting improved mood regulation and decreased anxiety.  (Tr. 1576).  At her subsequent visit on March 26, 2019, Plaintiff presented with increased mood dysregulation, increased anxiety, and some increased depression.  (Tr. 1603).  Plaintiff reported struggling with loneliness and restlessness; her speech was pressured, and she jumped from topic to topic.

On March 27, 2019, Plaintiff saw Dr. Scholma.  (Tr. 1598).  She reported difficulties, and mood swings without motivation or purpose. She was trying to lose weight and improve her self-care. Dr. Scholma opined Plaintiff had improved a little with Pristiq.  (Tr. 1602).  Dr. Scholma confirmed Plaintiff could cut back on the Clonazepam since she was feeling a little better; Plaintiff's diagnoses remained the same and Dr. Scholma increased Pristiq to 100 mg.

On April 22, 2019, Dr. Scholma completed a mental medical treating source statement on Plaintiff's behalf.  (Tr. 1971-1973).  Dr. Scholma opined Plaintiff was not significantly limited in the following areas: understanding and remembering short and simple instructions; understanding and remembering detailed instructions; carrying out very short and simple instructions; and making simple work-related decisions.  (Tr. 1971-1972).  Dr. Scholma concluded Plaintiff was moderately limited in the following areas: remembering locations and work like procedures; carrying out detailed instructions; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; sustaining an ordinary routine without special supervision; working in coordination with or proximity to others without being distracted by them; interacting appropriately with the general public; asking simple questions or requesting assistance; maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; responding appropriately to changes in the work setting; being aware of normal hazards and taking appropriate precautions; and setting realistic goals or making plans independent of others.  (Tr. 1972).

According to Dr. Scholma, Plaintiff was markedly limited in the following areas: maintaining attention and concentration for extended periods; completing a normal workday and work week without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; and traveling in unfamiliar places or using public transportation.  Dr. Scholma further opined that Plaintiff had the capacity to perform the following work-related mental activities on a sustained basis: understanding, remembering, and carrying out simple instructions; and making judgments that are commensurate with the

24

functions of unskilled work – i.e., simple work-related decisions. (Tr. 1973). Dr. Scholma found Plaintiff did not have the capacity to perform the following work-related mental activities on a sustained basis: responding appropriately to supervision, coworkers, and usual work situations; and dealing with changes in a routine work setting. Dr. Scholma concluded that Plaintiff is likely to be off task for 20% of the day (i.e., approx. 1.5 hours) or more due to symptoms related to his/her impairments during a typical 40-hour work week and that Plaintiff is likely to be absent two or more days a month due to symptoms related to her impairment. Dr. Scholma affirmed that if drug addiction and/or alcoholism is a diagnosis, his statement sets for the limitations and abilities remining if the claimant stopped using drugs and/or alcohol.

On December 4, 2019, Dr. Scholma completed a physical medical source statement on Plaintiff's behalf. (Tr. 1975). Dr. Scholma stated that Plaintiff is likely to be off task for 25% of the day (i.e., extended 15-minute break every hour out of an 8-hour day) or more due to symptoms related to her impairment during a typical 40-hour week. He also noted that Plaintiff is likely to be absent two days or more a month due to symptoms related to her impairment. Additionally, Dr. Scholma concluded Plaintiff is not likely to be off task for 3-4 hours out of a day due to laying down because of pain and medications making Plaintiff drowsy and tired.

Plaintiff returned to Dr. Scholma on March 9, 2020. (Tr. 1985-2000). Plaintiff was feeling a little more depressed and lacked the enthusiasm. She had not attended therapy recently but was interested in seeing a therapist again. She continued to take Clonazepam at night with good results. Plaintiff's mental status exam was mostly normal, except her motor function was hyperactive, rapid, and she constantly moved her legs and changed positions. (Tr. 1990). Dr. Scholma opined she was doing well overall with the treatment of her mood and anxiety. (Tr. 1990). Since lowering a prescribed Abilify dose, Plaintiff did not have good mood control, although her motor

movements improved. Dr. Scholma discussed changing Abilify to Rexulti to improve her mood and relieve the tardive movements. Dr. Scholma continued Pristiq 100 mg daily, prescribed Rexulti 0.5 mg and then 1 mg daily, and continued Clonazepam 1 mg. (Tr. 1990-1991). Plaintiff reported using medical marijuana periodically for insomnia and her diagnoses remained unchanged. (Tr. 1991).

Plaintiff next saw Dr. Scholma via video teleconference on April 21, 2020. (Tr. 2008-2019). Plaintiff stated the pandemic brought her life to a screeching halt. (Tr. 2008). Dr. Scholma found Plaintiff mostly stable and managing the pandemic well, though he noted there was room for improvement. (Tr. 2013). He increased Rexulti to 2 mg daily, continued Pristiq 100 mg and Clonazepam 1mg, and his diagnoses remained the same. (Tr. 2013-2014).

On August 29, 2020, Dr. Scholma completed another mental medical source statement on behalf of Plaintiff. (Tr. 2020). Dr. Scholma concluded Plaintiff's ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances was markedly limited. In addition, he opined Plaintiff was markedly limited in her ability to complete a normal workday and work week without interruptions from psychologically based symptoms, and to perform at a consistent pace without any unreasonable number and length of rest periods. In the opinion, Dr. Scholma clarified his statement was for the period from November 18, 2014, to the present (August 2020).

## IV. Discussion

Plaintiff raises the following issues on appeal: (1) Whether the ALJ committed reversible error in finding that Plaintiff had a substance use disorder that was a contributing factor material to an otherwise favorable disability determination; (2) Whether the ALJ erred in evaluating Plaintiff's subjective complaints; (3) Whether the ALJ properly evaluated the medical opinion evidence; and (4) Whether the Commissioner applied the correct legal standard applicable to drug

26

and alcohol abuse materiality determinations.   (ECF No. 13, pp. 1-11; ECF No. 18, pp. 1-7).  Because the Court recommends remand, the Court will not address all these issues.

In cases involving drug addiction or alcoholism ("DAA"), the ALJ must determine whether DAA is material to the determination of disability.  *See Whittle v. Berryhill*, No. 4:18-CV-04095-VLD, 2019 WL 2124247, at *28-29 (D.S.D. May 15, 2019) (citing SSR 13-2p, § 5).   In order to determine if substance abuse is "material," the ALJ first evaluates all of the claimant's impairments, including the substance abuse.  *Malone v. Colvin*, No. CIV. 12-3098, 2014 WL 348590, at *3 (W.D. Ark. Jan. 31, 2014).   "The plain text of the relevant regulation requires the ALJ to first determine whether [a claimant] is disabled."  *Brueggemann v. Barnhart*, 348 F.3d 689, 694 (8th Cir. 2003) (citing 20 C.F.R. § 404.1535(a)).   Specifically, the ALJ must first determine if a claimant's symptoms, regardless of cause, constitute disability.  *Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010) (citing *Brueggemann*, 348 F.3d at 694).

The ALJ must then project which of the impairments, if any, would remain at a disabling level if the claimant stopped their substance abuse.  *Malone*, 2014 WL 348590, at *3 (citing SSR 13-2p; *Brueggemann*, 348 F.3d at 694-695).   "The focus of the inquiry is on the impairments remaining if the substance abuse ceased, and whether those impairments are disabling, regardless of their cause."  *Pettit v. Apfel*, 218 F.3d 901, 903 (8th Cir. 2000) (citing 20 C.F.R. § 404.1535(b)(1); *Jackson v. Apfel*, 162 F.3d 533, 537-538 (8th Cir. 1998)).  Although, the claimant carries the burden of proving substance abuse is not a contributing factor material to the claimed disability.  *Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002) (citing *Mittlestedt v. Apfel*, 204 F.3d 847, 852 (8th Cir. 2000)).   However, active and ongoing substance abuse does not automatically require a finding that the substance abuse is material.  *Malone*, 2014 WL 348590, at *3 (citing SSR 13-2p; *Brueggemann*, 348 F.3d at 695).   Rather, the ALJ must take on the

challenging task of untangling the warp threads of the claimant's substance abuse from the woof threads of the claimant's other impairments to examine the hypothetical cloth that remains. *Taylor v. Colvin*, No. CIV. 13-2108, 2014 WL 2584826, at *3 (W.D. Ark. June 10, 2014).

When there are concurrent mental disorders in addition to a claimant's DAA, as here, SSR 13-2p makes clear that the ALJ must be able to separate the effects of the two types of impairments to find DAA material. *Nelson v. Saul*, 413 F. Supp. 3d 886, 912–13 (E.D. Mo. 2019). In this case, the evidence relied on by the ALJ does not adequately separate the effects of Plaintiff's substance abuse from the effects of her co-occurring mental disorders of ADHD, mood disorder, anxiety disorder, borderline personality disorder, PTSD, and Bipolar Type II disorder. Furthermore, the Court cannot discern how the ALJ could have adequately considered Plaintiff's functioning during periods of sobriety when the ALJ never clearly identified Plaintiff's period of sobriety. *Malone*, 2014 WL 348590, at *3. In his decision, the ALJ stated that "there does not appear to be any sustained periods where the claimant is not noted to be using some substance." (Tr. 15). The ALJ also stated that treatment notes report a history of cocaine and methamphetamine; however, there are periods of relevant time where Plaintiff was not abusing any substances or over-taking medication and while treatment notes report a *history* of cocaine and methamphetamine, there are no medical records revealing the use of cocaine or methamphetamine (or positive tests for either of those drugs) during the disability period.

Plaintiff's treating psychiatrist for over six years, Dr. Scholma, opined that Plaintiff's limitations would remain even if she stopped abusing substances. (Tr. 1973). Although there are medical examinations documenting normal findings during the disability period, even *after* Plaintiff's Adderall prescription was discontinued in November 2018 due to misuse, Plaintiff manifested tearful and labile affect, slow speech, pressured speech, jumping from topic to topic,

irritability, anger at times, disorganized thoughts, hyper-focus on existential thoughts and themes, recurrent thoughts of death and suicide, anxiety, somatic symptoms, emotional outbursts, isolation, depression, and mood dysregulation.  (Tr. 1536, 1538, 1541-1545, 1546, 1548-1549, 1550, 1553, 1555, 1556, 1576, 1598, 1602-1603, 1985-2000, 2008-2013).  The Commissioner argues the main difference between Plaintiff's RFC with and without substance abuse is that, with substance abuse, the ALJ found Plaintiff would be off task 20 percent of the workday due to difficulty having a good relationship with others, communicating with others, and difficulty concentrating, including becoming hyper-focused.  (ECF No. 17, p. 2).  The Commissioner asserts this is consistent with records showing that when using/abusing substances, Plaintiff was hyper-focused, nervous, anxious, irritable, and angry at times.  (ECF No. 17, pp. 2-3).  As discussed above, the medical record establishes Plaintiff exhibited those symptoms after her Adderall was discontinued in 2018 and off and on throughout the entirety of the disability period.  Moreover, the ALJ found Plaintiff had a marked limitation with interacting with others including substance abuse and if substance abuse was stopped, citing the same reasons in both of his findings.  (Tr. 13-14, 18).

Plaintiff's medical records support that her symptoms waxed and waned, and recognition must be given to the instability of mental impairments and their waxing and waning nature after manifestation.  *See Lillard v. Berryhill*, 376 F. Supp. 3d 963, 984 (E.D. Mo. 2019) (citing *Rowland v. Astrue*, 673 F.Supp.2d 902, 920-21 (D.S.D. 2009).  Evaluation of a mental impairment is frequently more complicated than evaluation of a claimed physical impairment.  *Andler v. Chater*, 100 F.3d 1389, 1393 (8th Cir. 1996).  Evidence of symptom-free periods, which may negate the finding of a physical disability, do not compel a finding that disability based on a mental disorder has ceased.  *Id*.  Mental illness can be extremely difficult to predict, and remissions are often of "uncertain duration and marked by the impending possibility of relapse." *Id*.

After thoroughly reviewing the record and for the reasons stated above, we conclude that the ALJ's decision is not supported by substantial evidence and should be reversed and remanded to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).  On remand, the ALJ is directed to recontact Dr. Scholma, Counselor Moore, and Dr. Downing to more fully develop the record concerning Plaintiff's mental limitations and RFC.  The ALJ must address Plaintiff's request to amend the onset date and explain his decision.  The ALJ is also directed to order a consultative examination with a neurologist to evaluate if Plaintiff's substance abuse produced permanent physical or mental damage, and if so, what the effects of that damage are on Plaintiff's functional abilities.  Finally, the ALJ is directed to determine if there are any identifiable periods of sobriety, and to make the appropriate evaluation of Plaintiff's function during that time. With this additional information, the ALJ should revisit the sequential DAA evaluation process from the RFC assessment forward, because the record needs to be further developed regarding whether DAA is material to Plaintiff's disability.

## V.    <u>Conclusion</u>

Based upon the foregoing, it is recommended that the Commissioner's decision denying benefits be reversed and remanded for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).  **The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  We remind the parties that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 26th day of April 2022.

*Christy Comstock*

CHRISTY COMSTOCK
UNITED STATES MAGISTRATE JUDGE